1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   DARREN J. ROBBINS (168593)
    BRIAN E. COCHRAN (286202)
3   655 West Broadway, Suite 1900
    San Diego, CA  92101
4   Telephone:  619/231-1058
    619/231-7423 (fax)
5   darrenr@rgrdlaw.com
    bcochran@rgrdlaw.com
6
    Attorneys for Plaintiffs
7
    [Additional counsel appear on signature page.]
8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11   YORK COUNTY ON BEHALF OF THE ) COUNTY OF YORK RETIREMENT FUND, ) 12   CITY OF WARREN POLICE AND FIRE ) RETIREMENT SYSTEM and MID-JERSEY ) 13   TRUCKING INDUSTRY & LOCAL NO. 701 ) PENSION FUND, Individually and on Behalf ) of All Others Similarly Situated, ) 14                                  ) 15                    Plaintiffs, ) ) 16          vs. ) ) 17   BARBARA L. RAMBO, GEISHA J. ) WILLIAMS, NICKOLAS STAVROPOULOS, ) 18   DAVID S. THOMASON, DINYAR B. ) MISTRY, LEWIS CHEW, ANTHONY F. ) 19   EARLEY, JR., FRED J. FOWLER, ) MARYELLEN C. HERRINGER, RICHARD ) 20   C. KELLY, ROGER H. KIMMEL, RICHARD ) A. MESERVE, FORREST E. MILLER, ) 21   BARRY LAWSON WILLIAMS, ROSENDO ) G. PARRA, ANNE SHEN SMITH, ERIC D. ) 22   MULLINS, BARCLAYS CAPITAL INC., ) BNP PARIBAS SECURITIES CORP., ) 23   MORGAN STANLEY & CO. LLC, MUFG ) SECURITIES AMERICAS, INC. f/k/a ) 24   MITSUBISHI UFJ SECURITIES (USA), ) INC., THE WILLIAMS CAPITAL GROUP, ) 25   L.P., CITIGROUP GLOBAL MARKETS ) INC., J.P. MORGAN SECURITIES LLC, ) 26   MERRILL LYNCH, PIERCE, FENNER & ) SMITH INCORPORATED, MIZUHO ) 27   SECURITIES USA LLC, GOLDMAN, ) | Case No.  CLASS ACTION  COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933                                                            DEMAND FOR JURY TRIAL |

27 _____ )

28 [Caption continued on following page.]

1  SACHS & CO., LLC, RBC CAPITAL                )
   MARKETS, LLC, WELLS FARGO                    )
2  SECURITIES, LLC, BNY MELLON                  )
   CAPITAL MARKETS, LLC, TD                     )
3  SECURITIES (USA) LLC, C.L. KING &            )
   ASSOCIATES, INC., GREAT PACIFIC             )
4  SECURITIES, CIBC WORLD MARKETS              )
   CORP., SMBC NIKKO SECURITIES                 )
5  AMERICA, INC., U.S. BANCORP                  )
   INVESTMENTS, INC., LEBENTHAL & CO., )
6  LLC, MISCHLER FINANCIAL GROUP,              )
   INC., BLAYLOCK VAN, LLC, SAMUEL A.          )
7  RAMIREZ & COMPANY, INC. and MFR             )
   SECURITIES, INC.,                           )
8                                               )
                          Defendants.          )
9  _____)

1    Plaintiffs York County on behalf of the County of York Retirement Fund, City of Warren

2    Police and Fire Retirement System and Mid-Jersey Trucking Industry & Local No. 701 Pension

3    Fund ("plaintiffs"), individually and on behalf of all others similarly situated, by plaintiffs'

4    undersigned attorneys, for plaintiffs' complaint against defendants, allege the following based upon

5    the investigation conducted by and through plaintiffs' attorneys, which included, among other things,

6    a review of U.S. Securities and Exchange Commission ("SEC") filings by PG&E Corporation and

7    Pacific Gas and Electric Company (the "Utility," or, together with PG&E Corporation, "PG&E" or

8    the "Company"), Company press releases, analyst reports on the Company, and media reports and

9    other publicly disclosed reports and information about the Company.  Plaintiffs believe that

10   substantial additional evidentiary support will exist for the allegations set forth herein after a

11   reasonable opportunity for discovery.

12                              **NATURE OF THE ACTION**

13        1.      This is a securities class action on behalf of all persons or entities that acquired PG&E

14   senior notes in or traceable to the Company's Notes Offerings, as detailed herein, seeking to pursue

15   remedies under the Securities Act of 1933 (the "1933 Act") against certain of the Company's

16   officers and directors, and the underwriters of the Notes Offerings.[1]

17        2.      PG&E is a California utility that provides electricity to central and northern

18   California.  Since March 2016, PG&E has issued over $4 billion worth of senior notes registered

19   with the SEC.  After selling billions of dollars' worth of bonds, PG&E has been implicated in

20   several of the most destructive wildfires in history.  In October 2017, a series of devastating fires,

21   which became known as the Northern California Fires, ravaged at least 245,000 acres of land and

22   killed 44 people.  At the time, the fires were the most destructive in California history and were

23   responsible for over $13 billion in damages.

24

25

---

26   [1]   "Notes Offerings" refers to the Company's March 2016 public offering of senior notes (the
     "March 2016 Notes Offering"), the Company's December 2016 public offering of senior notes (the
27   "December 2016 Notes Offering"), the Company's March 2017 public offering of senior notes (the
     "March 2017 Notes Offering"), and the Company's April 2018 public offering of senior notes (the
28   "April 2018 Notes Offering").

3.      Then, little more than a year later, the tragedy of the Northern California Fires would be surpassed by an even more destructive and deadly blaze, the Camp Fire, which ignited in November 2018 in Butte County, California.  This catastrophic event claimed the lives of at least 86 people and caused an estimated $16.5 billion in damages.  The Camp Fire was reportedly the world's costliest natural disaster in 2018.

4.      As investigators sort through the wreckage of these devastating fires, a picture of PG&E's shocking failure to take proper fire mitigation measures, at the same time that it was selling billions of dollars' worth of bonds, has come to light.   These events directly contradict the representations made by defendants in the offering documents for the Notes Offerings.  For example, of the first 18 major Northern California Fires for which the California Department of Forestry and Fire Protection ("Cal Fire") has determined a cause, *all 18* were found to have been started by PG&E equipment.  Of these, Cal Fire concluded that 12 – or *two-thirds* – had resulted from PG&E's failure to follow applicable laws and regulations regarding vegetation management.  The agency referred these cases to the appropriate District Attorney's offices for possible criminal prosecution.  Similarly, PG&E's failure to properly maintain a transmission tower has been cited as the most likely source of the Camp Fire, meaning that PG&E has been implicated in directly causing the two most destructive wildfire events in California history in a span of only 13 months.  Prosecutors have stated that PG&E's conduct could amount to implied-malice murder, depending on the conclusions reached by ongoing investigations.

5.      In addition, in-depth reporting has exposed the Company's lax wildfire safety practices.  From June 2014 through December 2017, PG&E equipment was found to have caused over *1,500 fires* across almost the entirety of the Company's service area, or more than one fire per day on average.  In addition, the Company reportedly had not improved its fire prevention measures as represented and failed to even produce a fire mitigation report as mandated by California state law.  Regulators have also concluded that the Company falsified safety and reporting data, further demonstrating the Company's systemic aversion to basic risk mitigation measures.  Now, PG&E has declared bankruptcy, as it faces a slew of criminal probes, regulatory investigations and civil lawsuits, with the Company's potential liability estimated to reach as high as *$30 billion*.

6.  As a result of these tragic events, the prices of PG&E bonds have plummeted, adding hundreds of millions of dollars' in investor losses to the devastation wrought by the Company's conduct.  This action seeks recompense for those losses under the federal securities laws.

## JURISDICTION AND VENUE

7.  The claims alleged herein arise under §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o.

8.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

9.  Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because PG&E maintains offices and operations in this District and many of the acts and practices complained of herein occurred in substantial part in this District, including the preparation of the defective registration statements for the Notes Offerings as detailed herein.

10.  In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## BANKRUPT ENTITIES

11.  Pacific Gas and Electric Company is a California public utility operating in northern and central California, with headquarters in San Francisco.  The Utility is the registrant and issuer of the PG&E senior notes issued in the Notes Offerings.  The Utility has declared bankruptcy and is therefore not named as a defendant in this action due to the automatic stay of proceedings under the federal bankruptcy laws.   But for the automatic stay of proceedings, the Utility would be named as a defendant for all counts asserted herein.

12.  PG&E Corporation is a holding company whose primary operating subsidiary is Pacific Gas and Electric Company.  PG&E Corporation is headquartered in the same San Francisco building as the Utility, and it shares an overlapping board of directors with the Utility.  As the parent and owner of the Utility, PG&E Corporation also issued and sold the PG&E senior notes issued in the Notes Offerings.  Like the Utility, PG&E Corporation has declared bankruptcy and is therefore not named as a defendant in this action due to the automatic stay of proceedings under the federal

1    bankruptcy laws.  But for the automatic stay of proceedings, PG&E Corporation would be named as
2    a defendant for all counts asserted herein.

3                                            **PARTIES**

4    **Plaintiffs**

5           13.    (a)    Plaintiff York County on behalf of the County of York Retirement Fund
6    acquired PG&E senior notes issued in the March 2016 Notes Offering and the April 2018 Notes
7    Offering as described in the Certification attached hereto and incorporated by reference, and has
8    been damaged thereby.

9                  (b)    Plaintiff City of Warren Police and Fire Retirement System acquired PG&E
10   senior notes issued in the April 2018 Notes Offering as described in the Certification attached hereto
11   and incorporated by reference, and has been damaged thereby.

12                 (c)    Plaintiff Mid-Jersey Trucking Industry & Local No. 701 Pension Fund
13   acquired PG&E senior notes issued in the December 2016 Notes Offering and the March 2017 Notes
14   Offering as described in the Certification attached hereto and incorporated by reference, and has
15   been damaged thereby.

16   **Officer and Director Defendants**

17          14.    Defendant Barbara L. Rambo ("Rambo") was a director of the Utility at the time of
18   the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering
19   and the April 2018 Notes Offering.  Rambo signed the registration statement for the March 2016
20   Notes Offering and the December 2016 Notes Offering, the registration statement for the March
21   2017 Notes Offering, and the registration statement for the April 2018 Notes Offering.

22          15.    Defendant Geisha J. Williams ("G. Williams") was a director of the Utility at the time
23   of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes
24   Offering and the April 2018 Notes Offering.  She was also the Chief Executive Officer ("CEO") and
25   President of PG&E Corporation from March 2017 until January 2019. G. Williams signed the
26   registration statement for the March 2017 Notes Offering and the registration statement for the April
27   2018 Notes Offering.

28

1    16.    Defendant Nickolas Stavropoulos ("Stavropolous") was a director of the Utility at the

2    time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

3    Offering and the April 2018 Notes Offering.  He was also the President and Chief Operating Officer

4    ("COO") of the Utility from March 2017 until September 2018, prior to which time he served as the

5    Utility's President of Gas.  Stavropolous signed the registration statement for the March 2017 Notes

6    Offering and the registration statement for the April 2018 Notes Offering.

7    17.    Defendant David S. Thomason ("Thomason") was the Vice President, Chief Financial

8    Officer ("CFO") and Controller of the Utility at the time of the December 2016 Notes Offering, the

9    March 2017 Notes Offering and the April 2018 Notes Offering.  Thomason signed the registration

10   statement for the March 2017 Notes Offering and the registration statement for the April 2018 Notes

11   Offering.

12   18.    Defendant Dinyar B. Mistry ("Mistry") was the Vice President, CFO and Controller

13   of the Utility at the time of the March 2016 Notes Offering, and PG&E's Senior Vice President of

14   Human Resources during the December 2016 Notes Offering, the March 2017 Notes Offering and

15   the April 2018 Notes Offering.  Mistry signed the registration statement for the March 2016 Notes

16   Offering and the December 2016 Notes Offering.

17   19.    Defendant Lewis Chew ("Chew") was a director of the Utility at the time of the

18   March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering

19   and the April 2018 Notes Offering.  Chew signed the registration statement for the March 2016

20   Notes Offering and the December 2016 Notes Offering, the registration statement for the March

21   2017 Notes Offering and the registration statement for the April 2018 Notes Offering.

22   20.    Defendant Anthony F. Earley, Jr. ("Earley") was a director of the Utility at the time

23   of the March 2016 Notes Offering, the December 2016 Notes Offering and the March 2017 Notes

24   Offering.  He was also Chairman of the Board of Directors of PG&E Corporation until December

25   2017, and PG&E Corporation's CEO and President until March 2017.  Earley signed the registration

26   statement for the March 2016 Notes Offering and the December 2016 Notes Offering and the

27   registration statement for the March 2017 Notes Offering.

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933                                        - 5 -

1         21.      Defendant Fred J. Fowler ("Fowler") was a director of the Utility at the time of the

2 March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering

3 and the April 2018 Notes Offering.  Fowler signed the registration statement for the March 2016

4 Notes Offering and the December 2016 Notes Offering, the registration statement for the March

5 2017 Notes Offering, and the registration statement for the April 2018 Notes Offering.

6         22.      Defendant Maryellen C. Herringer ("Herringer") was a director of the Utility at the

7 time of the March 2016 Notes Offering and the December 2016 Notes Offering.  Herringer signed

8 the registration statement for the March 2016 Notes Offering and the December 2016 Notes Offering

9 and the registration statement for the March 2017 Notes Offering.

10         23.      Defendant Richard C. Kelly ("Kelly") was a director of the Utility at the time of the

11 March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering

12 and the April 2018 Notes Offering.  He was also Chairman of the Board of PG&E Corporation

13 beginning in December 2017.  Kelly signed the registration statement for the March 2016 Notes

14 Offering and the December 2016 Notes Offering, the registration statement for the March 2017

15 Notes Offering, and the registration statement for the April 2018 Notes Offering.

16         24.      Defendant Roger H. Kimmel ("Kimmel") was a director of the Utility at the time of

17 the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering

18 and the April 2018 Notes Offering.  Kimmel signed the registration statement for the March 2016

19 Notes Offering and the December 2016 Notes Offering, the registration statement for the March

20 2017 Notes Offering, and the registration statement for the April 2018 Notes Offering.

21         25.      Defendant Richard A. Meserve ("Meserve") was a director of the Utility at the time

22 of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

23 Offering and the April 2018 Notes Offering.  Meserve signed the registration statement for the

24 March 2016 Notes Offering and the December 2016 Notes Offering, the registration statement for

25 the March 2017 Notes Offering, and the registration statement for the April 2018 Notes Offering.

26         26.      Defendant Forrest E. Miller ("Miller") was a director of the Utility at the time of the

27 March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering

28 and the April 2018 Notes Offering, and Chairman of the Utility's Board since May 2017.  Miller

1  signed the registration statement for the March 2016 Notes Offering and the December 2016 Notes

2  Offering, the registration statement for the March 2017 Notes Offering, and the registration

3  statement for the April 2018 Notes Offering.

4      27.    Defendant Barry Lawson Williams ("B. Williams") was a director of the Utility at the

5  time of the March 2016 Notes Offering and the December 2016 Notes Offering, during which time

6  he served as Chairman of the Utility's Board of Directors.  B. Williams signed the registration

7  statement for the March 2016 Notes Offering and the December 2016 Notes Offering and the

8  registration statement for the March 2017 Notes Offering.

9      28.    Defendant Rosendo G. Parra ("Parra") was a director of the Utility at the time of the

10  March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering

11  and the April 2018 Notes Offering.  Parra signed the registration statement for the March 2017 Notes

12  Offering and the registration statement for the April 2018 Notes Offering.

13      29.    Defendant Anne Shen Smith ("Smith") was a director of the Utility at the time of the

14  March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering

15  and the April 2018 Notes Offering.  Smith signed the registration statement for the March 2017

16  Notes Offering and the registration statement for the April 2018 Notes Offering.

17      30.    Defendant Eric D. Mullins ("Mullins") was a director of the Utility at the time of the

18  December 2016 Notes Offering, the March 2017 Notes Offering and the April 2018 Notes Offering.

19  Mullins signed the registration statement for the March 2017 Notes Offering and the registration

20  statement for the April 2018 Notes Offering.

21      31.    The defendants identified in ¶¶14-30 are referred to herein as the "Individual

22  Defendants."  The Individual Defendants signed the registration statements for one or more of the

23  Notes Offerings as detailed herein, and, as directors and/or executive officers of the Company,

24  participated in the solicitation and sale of PG&E senior notes to investors in the Notes Offerings for

25  their own benefit and the benefit of PG&E.

26  **Underwriter Defendants**

27      32.    Defendant Barclays Capital Inc. served as a lead underwriter for the March 2016

28  Notes Offering.

33. Defendant BNP Paribas Securities Corp. served as a lead underwriter for the March 2016 Notes Offering.

34. Defendant Morgan Stanley & Co. LLC served as a lead underwriter for the March 2016 Notes Offering.

35. Defendant MUFG Securities Americas, Inc. f/k/a Mitsubishi UFJ Securities (USA), Inc. served as a lead underwriter for the March 2016 Notes Offering.

36. Defendant The Williams Capital Group, L.P. served as a lead underwriter for the March 2016 Notes Offering.

37. Defendant Citigroup Global Markets Inc. served as a lead underwriter for the December 2016 Notes Offering.

38. Defendant J.P. Morgan Securities LLC served as a lead underwriter for the December 2016 Notes Offering.

39. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated served as a lead underwriter for the December 2016 Notes Offering.

40. Defendant Mizuho Securities USA LLC served as a lead underwriter for the December 2016 Notes Offering.

41. Defendant Goldman, Sachs & Co., LLC served as a lead underwriter for the March 2017 Notes Offering.

42. Defendant RBC Capital Markets, LLC served as a lead underwriter for the March 2017 Notes Offering.

43. Defendant Wells Fargo Securities, LLC served as a lead underwriter for the March 2017 Notes Offering.

44. Defendant BNY Mellon Capital Markets, LLC served as an underwriter for the March 2016 Notes Offering and the March 2017 Notes Offering.

45. Defendant TD Securities (USA) LLC served as an underwriter for the March 2016 Notes Offering and the March 2017 Notes Offering.

46. Defendant C.L. King & Associates, Inc. served as an underwriter for the March 2016 Notes Offering.

1      47.     Defendant Great Pacific Securities served as an underwriter for the March 2016 Notes

2 Offering.

3      48.     Defendant CIBC World Markets Corp. served as an underwriter for the December

4 2016 Notes Offering.

5      49.     Defendant SMBC Nikko Securities America, Inc. served as an underwriter for the

6 December 2016 Notes Offering.

7      50.     Defendant U.S. Bancorp Investments, Inc. served as an underwriter for the December

8 2016 Notes Offering.

9      51.     Defendant Lebenthal & Co., LLC served as an underwriter for the December 2016

10 Notes Offering.

11      52.     Defendant Mischler Financial Group, Inc. served as an underwriter for the December

12 2016 Notes Offering.

13      53.     Defendant Blaylock Van, LLC served as an underwriter for the March 2017 Notes

14 Offering.

15      54.     Defendant Samuel A. Ramirez & Company, Inc. served as an underwriter for the

16 December 2016 Notes Offering.

17      55.     Defendant MFR Securities, Inc. served as an underwriter for the March 2017 Notes

18 Offering.

19      56.     The defendants identified in ¶¶32-55 are referred to herein as the "Underwriter

20 Defendants." The Underwriter Defendants served as underwriters for the Notes Offerings and sold

21 billions of dollars' worth of PG&E senior notes in the Note Offerings, for which they collectively

22 received tens of millions of dollars in fees and commissions. The Underwriter Defendants drafted

23 and disseminated the offering documents used to effectuate each of the Note Offerings. The

24 Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial

25 factor leading to the harm complained of herein.

26

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933        - 9 -

1

**SUBSTANTIVE ALLEGATIONS**

2

**Background**

3          57.    PG&E Corporation is a California holding company whose primary operating

4   subsidiary is Pacific Gas and Electric Company, a public utility operating in northern and central

5   California.  PG&E Corporation became the holding company of the Utility and its subsidiaries in

6   1997.  The Utility generates revenues mainly through the sale and delivery of electricity and natural

7   gas to customers.

8          58.    PG&E's ability to maintain safe electrical equipment that complies with state

9   regulations and minimizes the risk of causing wildfires is critical to the Company's business and

10  prospects.  California law includes a doctrine of inverse condemnation that is routinely invoked in

11  California for wildfire damages. Inverse condemnation imposes strict liability for damages and

12  takings as a result of the design, construction and maintenance of utility facilities, including its

13  electric transmission lines.  In order to meet its obligations to maintain safe equipment that does not

14  pose an unreasonable hazard, PG&E must regularly service and maintain its equipment, including by

15  clearing vegetation away from its power lines as required by California law, including California

16  Public Resources Code §4292 and §4293.  In addition, as of July 2018, another California safety

17  regulation, California Public Utilities Commission ("CPUC") Resolution ESRB-8, requires PG&E to

18  temporarily shut off its power lines when certain dangerous conditions are present that make an area

19  susceptible to wildfires, including high wind speed and low humidity.

20         59.    PG&E's failure to follow these safety requirements resulted in numerous devastating

21  wildfires in October 2017 and November 2018, causing catastrophic loss of life and destruction of

22  property.  In all, the Company has been implicated in causing more than *1,500 fires*, including some

23  of the most widespread and destructive wildfires in California history.  PG&E's shocking and abject

24  failure to implement required safety precautions even as the risk of wildfires increased has only

25  recently come to light. Now, the Company has filed Chapter 11 bankruptcy, as it faces a host of

26  regulatory investigations, criminal probes and civil lawsuits that expose PG&E to an estimated *$30*

27  *billion* in potential liability.

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933                              - 10 -

60.     At the same time that PG&E's equipment was posing an unreasonable risk to the lives and property of California residents – indeed, even as the Company's equipment was in the midst of setting hundreds of wildfires – PG&E raised billions of dollars from investors through the sale of senior notes. From March 2016 to May 2018, PG&E offered and sold approximately $4.35 billion worth of senior notes that it registered with the SEC to ensure that the notes could be widely sold and distributed to the investing public.  PG&E's conduct has subsequently been revealed to contradict the representations made to investors in the offering documents for the Notes Offerings, and now poses an existential threat to the Company.  Subsequent to, and due to, defendants' failure to disclose the true state of PG&E's business and operations and the risks posed by the Company's lax wildfire safety practices, the value of these senior notes has substantially declined.

**The March 2016 Notes Offering**

61.     On or about February 24, 2016, PG&E filed a prospectus supplement for the March 2016 Notes Offering on Form 424B2, which amended by fundamental change and formed part of an earlier shelf registration statement filed on Form S-3ASR, for the delivery of senior notes on or about March 1, 2016 (the "March 2016 Registration Statement").  The March 2016 Registration Statement explicitly incorporated the Company's Form 10-K for the fiscal year December 31, 2015 (the "2015 Form 10-K"), which formed part of the March 2016 Registration Statement. Defendants offered and sold $600 million worth of 2.95% PG&E senior notes due March 1, 2026 pursuant to the March 2016 Registration Statement.

62.     The March 2016 Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

63.     For example, the March 2016 Registration Statement discussed the primary importance of the Company's revenues derived from the sale and delivery of electricity to California consumers, but failed to disclose the existential risk posed to the Company's business and operating results by its failure to properly maintain and service the electrical equipment used to generate these

1   revenues.  The March 2016 Registration Statement stated that PG&E "generate[s] revenues mainly

2   through the sale and delivery of electricity and natural gas to customers."

3       64.    The March 2016 Registration Statement highlighted the more than $13.6 billion in

4   revenues derived from the Company's electricity segment for fiscal 2015, which included a 5% year-

5   over-year increase in revenues impacting earnings, and provided the following table of the

6   Company's financial results in the incorporated 2015 Form 10-K:

7

*Electricity Operating Statistics*

The following table shows certain of the Utility's operating statistics from 2013 to 2015 for electricity sold or delivered, including the classification of revenues by type of service.  No single customer of the Utility accounted for 10% or more of consolidated revenues for electricity sold in 2015, 2014 and 2013.

| | 2015 | | 2014 | | 2013 |
|---|---|---|---|---|---|
| Customers (average for the year) | 5,311,178 | | 5,276,025 | | 5,243,216 |
| Deliveries (in GWh) [1] | 85,860 | | 86,303 | | 86,513 |
| Revenues (in millions): | | | | | |
| Residential | $ 5,032 | $ | 4,784 | $ | 5,091 |
| Commercial | 5,278 | | 5,141 | | 4,905 |
| Industrial | 1,555 | | 1,543 | | 1,388 |
| Agricultural | 1,233 | | 1,172 | | 1,021 |
| Public street and highway lighting | 83 | | 79 | | 75 |
| Other [2] | (84) | | (172) | | (128) |
|    Subtotal | 13,097 | | 12,547 | | 12,352 |
| Regulatory balancing accounts [3] | 560 | | 1,109 | | 137 |
| Total operating revenues | $ 13,657 | $ | 13,656 | $ | 12,489 |
| Selected Statistics: | | | | | |
| Average annual residential usage (kWh) | 6,294 | | 6,458 | | 6,752 |
| Average billed revenues per kWh: | | | | | |
| Residential | $ 0.1719 | $ | 0.1603 | $ | 0.1643 |
| Commercial | 0.1640 | | 0.1585 | | 0.1499 |
| Industrial | 0.0973 | | 0.0998 | | 0.0928 |
| Agricultural | 0.1610 | | 0.1516 | | 0.1454 |
| Net plant investment per customer | $ 6,660 | $ | 6,339 | $ | 6,002 |

[1] These amounts include electricity provided to direct access customers and CCAs who procure their own supplies of electricity.
[2] This activity is primarily related to a remittance of revenue to the Department of Water Resources ("DWR") (the Utility acts as a billing and collection agent on behalf of the DWR), partially offset by other miscellaneous revenue items.
[3] These amounts represent revenues authorized to be billed.

18       65.    The March 2016 Registration Statement also discussed the Butte fire, a major blaze

19   which had ignited in the Company's service area in Amador and Calaveras counties in September

20   2015 and ultimately damaged more than 70,000 acres of land.  The cause of the Butte fire was then

21   under investigation.  The March 2016 Registration Statement discussed the Butte fire in the context

22   of boilerplate disclosures about *force majeure* events, and failed to disclose the substantial likelihood

23   that the Company's failure to follow California safety regulations would lead to even more

24   destructive blazes. It stated in pertinent part:

25         Some of the factors that could cause future results to differ materially from those
      expressed or implied by the forward-looking statements, or from historical results,
26         include, but are not limited to:

27                      *      *      *

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933      - 12 -

- the impact of droughts or other weather-related conditions or events, **wildfires (including the Butte fire in September 2015**, which affected portions of Amador and Calaveras counties), climate change, natural disasters, acts of terrorism, war, or vandalism (including cyber-attacks), and other events, that can cause unplanned outages, reduce generating output, disrupt the our [sic] service to customers, or damage or disrupt the facilities, operations, or information technology and systems owned by us, our customers, or third parties on which we rely; whether we incur liability to third parties for property damage or personal injury caused by such events; and whether the we [sic] are subject to civil, criminal, or regulatory penalties in connection with such events.

66.     In addition, the March 2016 Registration Statement stated that the Company had taken proper precautions throughout 2015 to deal with the risks of climate change, including "wildfire risk," such as conducting a regular review of the "most relevant scientific literature," the identification of climate-related risks, the development of "necessary adaption strategies," and the maintenance of plans and procedures to address the risk of wildfires.  The March 2016 Registration Statement stated in pertinent part:

> *Climate Change Mitigation and Adaptation Strategies. **During 2015, the Utility continued its programs to develop strategies to mitigate the impact of the Utility's operations (including customer energy usage) on the environment and to plan for the actions that it will need to take to adapt to the likely impacts of climate change on the Utility's future operations.  The Utility regularly reviews the most relevant scientific literature on climate change such as sea level rise, temperature changes, rainfall and runoff patterns, and wildfire risk, to help the Utility identify and evaluate climate change-related risks and develop the necessary adaptation strategies.  The Utility maintains emergency response plans and procedures to address a range of near-term risks, including extreme storms, heat waves and wildfires and uses its risk-assessment process to prioritize infrastructure investments for longer-term risks associated with climate change**. The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future.*

67.     Similarly, the March 2016 Registration Statement stated that the Utility was developing "effective strategies for adapting to the expected increase in demand for electricity" due to climate change and "making substantial investments to build a more modern and resilient system that can better withstand extreme weather and related emergencies," which included "vegetation management activities" to "reduce the risk of wildfire impacts."  It stated in pertinent part:

> With respect to electric operations, climate scientists project that, sometime in the next several decades, climate change will lead to increased electricity demand due to more extreme, persistent, and frequent hot weather.  ***The Utility believes its strategies to reduce GHG emissions through energy efficiency and demand response programs, infrastructure improvements, and the use of renewable energy and energy storage are effective strategies for adapting to the expected increase in***

*demand for electricity.  **The Utility is making substantial investments to build a more modern and resilient system that can better withstand extreme weather and related emergencies.  The Utility's vegetation management activities also reduce the risk of wildfire impacts on electric and gas facilities**.  Over the long-term, the Utility also faces the risk of higher flooding and inundation potential at coastal and low elevation facilities due to sea level rise combined with high tides, storm runoff and storm surges.*

68.    While the March 2016 Registration Statement acknowledged the material importance to investors of the Company adopting appropriate climate change-related risk mitigation strategies, and the damage to the Company that "***may***" occur as a result of climate change, it failed to disclosed the heightened risk caused by PG&E's own conduct and failure to comply with applicable regulations governing the maintenance of electrical lines, and the hundreds of fires that were ***already*** being ignited annually by the Company's equipment.  It stated in pertinent part:

*The Utility's future operations may be affected by climate change that may have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows.*

*The Utility has been studying the potential effects of climate change (increased temperatures, changing precipitation patterns, rising sea levels) on the Utility's operations and is developing contingency plans to adapt to those events and conditions that the Utility believes are most significant.  Scientists project that climate change will increase electricity demand due to more extreme, persistent and hot weather.  Increasing temperatures and changing levels of precipitation in the Utility's service territory would reduce snowpack in the Sierra Mountains.  If the levels of snowpack were reduced, the Utility's hydroelectric generation would decrease and the Utility would need to acquire additional generation from other sources at a greater cost.  If the Utility increases its reliance on conventional generation resources to replace hydroelectric generation and to meet increased customer demand, it may become more costly for the Utility to comply with GHG emissions limits.  **In addition, increasing temperatures and lower levels of precipitation could increase the occurrence of wildfires in the Utility's service territory causing damage to the Utility's facilities or the facilities of third parties on which the Utility relies to provide service, damage to third parties for loss of property, personal injury, or loss of life**.  In addition, flooding caused by rising sea levels could damage the Utility's facilities, including hydroelectric assets such as dams and canals, and the electric transmission and distribution assets.  The Utility could incur substantial costs to repair or replace facilities, restore service, compensate customers and other third parties for damages or injuries. The Utility anticipates that the increased costs would be recovered through rates, but as rate pressures increase, the likelihood of disallowance or non-recovery may increase.*

69.    The March 2016 Registration Statement also represented that the Utility had made substantial improvements in its electrical transmission and distribution equipment during 2015 to "improve maintenance and system flexibility, reliability and safety."  It stated in pertinent part:

1    *Electricity Transmission*

2            At December 31, 2015, the Utility owned approximately 18,400 circuit miles
     of interconnected transmission lines operating at voltages ranging from 60 kV to 500

3    kV.  The Utility also operated 91 electric transmission substations with a capacity of
     approximately 63,400 MVA.

4
                              *        *        *

5

6            **Throughout 2015, the Utility upgraded several critical substations and re-
     conductored a number of transmission lines to improve maintenance and system
     flexibility, reliability and safety.    The Utility expects to undertake various**

7    **additional transmission projects over the next several years to upgrade and expand
     the capacity of its transmission system to accommodate system load growth, secure**

8    **access to renewable generation resources, replace aging or obsolete equipment and
     improve system reliability.  The Utility also has taken steps to improve the physical**

9    **security of its transmission substations and equipment**.

10   *Electricity Distribution*

11           The Utility's electricity distribution network consists of approximately
     142,000 circuit miles of distribution lines (of which approximately 20% are

12   underground and approximately 80% are overhead), 58 transmission switching
     substations, and 603 distribution substations, with a capacity of approximately

13   31,400 MVA.  The Utility's distribution network interconnects with its transmission
     system, primarily at switching and distribution substations, where equipment reduces

14   the high-voltage transmission voltages to lower voltages, ranging from 44 kV to 2.4
     kV, suitable for distribution to the Utility's customers.

15
             These distribution substations serve as the central hubs for the Utility's

16   electric distribution network.  Emanating from each substation are primary and
     secondary distribution lines connected to local transformers and switching equipment

17   that link distribution lines and provide delivery to end-users.  In some cases, the
     Utility sells electricity from its distribution facilities to entities, such as municipal

18   and other utilities, that resell the electricity.   In 2015 the Utility commenced
     operations in a new electric distribution control center facility in Rocklin, California,

19   and expects to complete an additional facility in Concord, California, in 2016. **These
     control centers form a key part of the Utility's efforts to create a smarter, more**

20   **resilient grid.**

21           **In 2015, the Utility continued to deploy its Fault Location, Isolation, and
     Service Restoration circuit technology which involves the rapid operation of smart**

22   **switches to reduce the duration of customer outages.  Another 83 circuits were
     outfitted with this equipment, bringing the total deployment to 700 of the Utility's**

23   **3200 distribution circuits.  The Utility also installed or replaced 20 distribution
     substation transformer banks to improve reliability and provide capacity to**

24   **accommodate growing demand.  The Utility plans to continue performing work to
     improve the reliability and safety of its electricity distribution operations in 2016.**

25           70.    In addition, the March 2016 Registration Statement highlighted risks that were

26   purportedly beyond PG&E's control, without discussing the severe wildfire risk caused by PG&E's

27   failure to maintain its power lines and equipment in accord with applicable regulations. For example,

28

1  March 2016 Registration Statement stated that the "Utility's ability to safely and reliably operate,

2  maintain, construct and decommission its facilities is **subject to numerous risks, many of which are**

3  **beyond the Utility's control**, including those that arise from: . . . **the breakdown or failure of**

4  **equipment, electric transmission or distribution lines**, or natural gas transmission and distribution

5  pipelines, **that can cause explosions, fires, or other catastrophic events**" and "**the failure to take**

6  **expeditious or sufficient action to mitigate operating conditions, facilities, or equipment, that the**

7  **Utility has identified, or reasonably should have identified, as unsafe, which failure then leads to**

8  **a catastrophic event (such as a wild land fire or natural gas explosion)**, and the failure to respond

9  effectively to a catastrophic event."

10       71.      The March 2016 Registration Statement also described the robust regulatory

11  requirements that the Utility was subject to "relating to the protection of the environment and the

12  safety and health of the Utility's personnel and the public," and that it had incurred "significant"

13  costs complying with applicable laws and regulations, but failed to disclose the Utility's pattern and

14  practice of circumventing regulations for the proper maintenance of electrical lines and the

15  mitigation of wildfire risks.  It stated in pertinent part:

16       *Environmental Regulation*

17              **The Utility's operations are subject to extensive federal, state and local laws**
         **and requirements relating to the protection of the environment and the safety and**
18       **health of the Utility's personnel and the public**.  These laws and requirements relate
         to a broad range of activities, including the remediation of hazardous and radioactive
19       substances; the discharge of pollutants into the air, water, and soil; the reporting and
         reduction of carbon dioxide ($CO_2$) and other GHG emissions; the transportation,
20       handling, storage and disposal of spent nuclear fuel; and the environmental impacts
         of land use, including endangered species and habitat protection. The penalties for
21       violation of these laws and requirements can be severe and may include significant
         fines, damages, and criminal or civil sanctions.  These laws and requirements also
22       may require the Utility, under certain circumstances, to interrupt or curtail
         operations. (See Item 1A. Risk Factors.)  Generally, the Utility recovers most of the
23       costs of complying with environmental laws and regulations in the Utility's rates,
         subject to reasonableness review.

24                            *        *        *

25
              **The Utility's operations are subject to extensive environmental laws and**
26       **changes in or liabilities under these laws could adversely affect PG&E**
         **Corporation's and the Utility's financial results.**
27
              The Utility's operations are subject to extensive federal, state, and local
28       environmental laws, regulations, orders, relating to air quality, water quality and

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933                              - 16 -

1    usage, remediation of hazardous wastes, and the protection and conservation of
2    natural resources and wildlife. ***The Utility incurs significant capital, operating, and
     other costs associated with compliance with these environmental statutes, rules,
3    and regulations.*** The Utility has been in the past, and may be in the future, required
     to pay for environmental remediation costs at sites where it is identified as a
4    potentially responsible party under federal and state environmental laws. Although
     the Utility has recorded liabilities for known environmental obligations, these costs
5    can be difficult to estimate due to uncertainties about the extent of contamination,
     remediation alternatives, the applicable remediation levels, and the financial ability
6    of other potentially responsible parties.

7    72.    The statements in ¶¶63-71 were materially false and misleading when made because

8    they failed to disclose the following adverse facts that existed at the time of the March 2016 Notes

9    Offering:

10            (a)    that PG&E had engaged in a pattern and practice of ignoring California safety

11   regulations and failed to take appropriate measures to mitigate wildfire hazards;

12            (b)    that PG&E's electrical equipment posed an unreasonable risk of catastrophic

13   loss to those who lived in the Company's service areas due to the Company's failure to follow

14   proper fire prevention measures, such as clearing vegetation, insulating electrical lines, shutting off

15   power during extreme weather events, sufficiently maintaining and inspecting electrical lines and

16   transmission towers to detect and remedy deficiencies, instilling a corporate safety culture and

17   incentive structure to promote fire safety, properly allocating resources to fire prevention, and other

18   similar measures;

19            (c)    that PG&E had systematically violated California Public Resources Code

20   §4293, which required the Utility to maintain a minimum distance between trees and other

21   vegetation and electrical transmission lines depending on line voltage;

22            (d)    that PG&E had not materially changed its vegetation management practices

23   following the 2015 Butte fire, including by failing to significantly improve its removal of dead and

24   dying trees that posed a serious fire risk because of their proximity to power lines;

25            (e)    that PG&E had incentivized short-term financial goals, such as the

26   continuation of service even in high-risk weather conditions, at the expense of fire safety and

27   prevention and the long-term success of the Company;

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933                                    - 17 -

1    (f)    that PG&E had not meaningfully implemented California Senate Bill 1028

2    ("SB 1028"), which required the Utility to develop a comprehensive plan to mitigate fire dangers;

3    (g)    that PG&E equipment had caused hundreds of fires across California since

4    June 2014, averaging more than one fire a day;

5    (h)    that the Butte fire was not an isolated incident, but part of a Company-wide

6    pattern and practice of disregard for proper risk mitigation techniques and regulatory requirements

7    that extended throughout the Company's electricity operations; and

8    (i)    that, as a result of (a)-(h), above, PG&E's financial results and its

9    representations regarding its business and prospects included in the March 2016 Registration

10   Statement were materially misleading.

11   73.    Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item

12   303"), requires defendants to "[d]escribe any known trends or uncertainties that have had or that the

13   registrant reasonably expects will have a material favorable or unfavorable impact on net sales or

14   revenues or income from continuing operations."  Similarly, Item 503 of SEC Regulation S-K, 17

15   C.F.R. §229.503(c) ("Item 503"), requires, in the "Risk Factors" section of registration statements

16   and prospectuses, "a discussion of the most significant factors that make the offering speculative or

17   risky" and requires each risk factor to "adequately describe[] the risk."  The failure of the March

18   2016 Registration Statement to disclose that PG&E had systematically violated California

19   regulations regarding fire prevention and failed to take reasonable steps to mitigate fire dangers

20   violated 17 C.F.R. §229.303(a)(3)(ii), because these undisclosed facts were known to PG&E and

21   would (and did) have an unfavorable impact on the Company's sales, revenues and income from

22   continuing operations.  This failure also violated 17 C.F.R. §229.503(c), because these specific risks

23   were not adequately disclosed, or disclosed at all, even though they were some of the most

24   significant factors that made an investment in PG&E notes speculative or risky.

25   **The December 2016 Notes Offering**

26   74.    On or about November 29, 2016, PG&E filed a prospectus supplement for the

27   December 2016 Notes Offering on Form 424B2, which amended by fundamental change and formed

28   part of an earlier shelf registration statement filed on Form S-3ASR, for the delivery of senior notes

on or about December 1, 2016 (the "December 2016 Registration Statement"). Like the March 2016 Registration Statement, the December 2016 Registration Statement explicitly incorporated PG&E's 2015 Form 10-K. In addition, it also explicitly incorporated three 2016 quarterly reports filed by PG&E on Form 10-Q, each of which formed part of the December 2016 Registration Statement.

75.     Defendants offered and sold $250 million worth of floating rate PG&E senior notes due November 30, 2017 and $400 million worth of 4.00% PG&E senior notes due December 1, 2046 pursuant to the December 2016 Registration Statement.

76.     The December 2016 Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

77.     The December 2016 Registration Statement contained substantially similar materially false and misleading statements as those contained in the March 2016 Registration Statement and identified in ¶¶63-71, including, *inter alia*, representations that the "***Utility's vegetation management activities . . . reduce the risk of wildfire impacts on electric and gas facilities***" and that the "***Utility is making substantial investments to build a more modern and resilient system that can better withstand extreme weather and related emergencies***."

78.     In addition, the December 2016 Registration Statement highlighted the more than $11 billion in revenues derived from the Company's electricity segment for the first nine months of 2016 and provided the following table (as excerpted) of the Company's financial results:

PART I. FINANCIAL INFORMATION
ITEM 1. CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

**PG&E CORPORATION**
**CONDENSED CONSOLIDATED STATEMENTS OF INCOME**

| | | | | | (Unaudited) | | | |
|---|---|---|---|---|---|---|---|---|
| | | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | |
| (in millions, except per share amounts) | | 2016 | | 2015 | | 2016 | | 2015 |
| **Operating Revenues** | | | | | | | | |
| Electric | $ | 3,994 | $ | 3,868 | $ | 10,590 | $ | 10,344 |
| Natural gas | | 816 | | 682 | | 2,363 | | 2,322 |
| **Total operating revenues** | | 4,810 | | 4,550 | | 12,953 | | 12,666 |
| **Operating Expenses** | | | | | | | | |
| Cost of electricity | | 1,613 | | 1,681 | | 3,719 | | 3,958 |
| Cost of natural gas | | 80 | | 50 | | 377 | | 442 |
| Operating and maintenance | | 1,783 | | 1,621 | | 5,631 | | 5,028 |
| Depreciation, amortization, and decommissioning | | 694 | | 653 | | 2,090 | | 1,935 |
| **Total operating expenses** | | 4,170 | | 4,005 | | 11,817 | | 11,363 |
| **Operating Income** | | 640 | | 545 | | 1,136 | | 1,303 |
| Interest income | | 8 | | 2 | | 17 | | 6 |
| Interest expense | | (211) | | (194) | | (621) | | (575) |
| Other income, net | | 24 | | 24 | | 74 | | 100 |
| **Income Before Income Taxes** | | 461 | | 377 | | 606 | | 834 |
| Income tax provision (benefit) | | 70 | | 67 | | (105) | | 84 |
| **Net Income** | | 391 | | 310 | | 711 | | 750 |
| Preferred stock dividend requirement of subsidiary | | 3 | | 3 | | 10 | | 10 |
| **Income Available for Common Shareholders** | $ | 388 | $ | 307 | $ | 701 | $ | 740 |

79.     Moreover, the December 2016 Registration Statement stated that, in April 2016, Cal Fire had released a report concluding that the Butte fire was caused "when a Gray Pine tree contacted the Utility's electric line which ignited portions of the tree, and determined that the failure by the Utility and/or its vegetation management contractors . . . to identify certain potential hazards during its vegetation management program ultimately led to the failure of the tree." The December 2016 Registration Statement failed to disclose that this fire was not an isolated incident, but one of hundreds of fires being ignited by PG&E's pattern and practice of failing to properly maintain its equipment throughout its service areas. Instead, the December 2016 Registration Statement provided the Utility's denial that its negligence had caused the blaze, stating: "***The Utility believes it was not negligent*** . . . ." In addition, the December 2016 Registration Statement stated that the estimated costs for the fire would be relatively modest as compared to the Company's revenues and insurance coverage. For example, it stated that estimated losses attributable to the fire were $350 million (compared to the Company's 2015 annual revenues of over $16 billion), and that the Utility "plans to seek recovery of all insured losses" and "believes that a significant portion of costs incurred for third-party claims (and associated legal expenses) relating to Butte fire will ultimately be recovered through its insurance."

80.     The statements in ¶¶77-79 were materially false and misleading when made because they failed to disclose the adverse facts listed in ¶72, which existed at the time of the December 2016 Notes Offering and rendered PG&E's financial results and its representations regarding its business and prospects included in the December 2016 Registration Statement materially misleading.

81.     Moreover, the failure of the December 2016 Registration Statement to disclose that PG&E had systematically violated California regulations regarding fire prevention and failed to take reasonable steps to mitigate fire dangers violated Item 303, because these undisclosed facts were known to PG&E and would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations.  This failure also violated Item 503 because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in PG&E notes speculative or risky.

**The March 2017 Notes Offering**

82.     On or about March 8, 2017, PG&E filed a prospectus supplement for the March 2017 Notes Offering on Form 424B2, which formed part of a registration statement filed on Form S-3 on January 4, 2017, for the delivery of senior notes on or about March 10, 2017 (the "March 2017 Registration Statement").  The March 2017 Registration Statement explicitly incorporated the Company's Form 10-K for the fiscal year ended December 31, 2016, which formed part of the March 2017 Registration Statement.  Defendants offered and sold $400 million worth of 3.30% PG&E senior notes due March 15, 2027 and $200 million worth of 4.00% PG&E senior notes due December 1, 2046 pursuant to the March 2017 Registration Statement.

83.     The March 2017 Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

84.     The March 2017 Registration Statement contained substantially similar materially false and misleading statements as those contained in the March 2016 Registration Statement and the December 2016 Registration Statement identified in ¶¶63-71, including, *inter alia*, the statements that the "***Utility's vegetation management activities . . . reduce the risk of wildfire impacts on***

1   *electric and gas facilities*" and that the "***Utility is making substantial investments to build a more***

2   ***modern and resilient system that can better withstand extreme weather and related emergencies***."

3          85.    In addition, the March 2017 Registration Statement highlighted the more than $13.8

4   billion in revenues derived from the Company's electricity segment for fiscal 2016, which included a

5   7% year-over-year increase in revenues impacting earnings, and provided the following table of the

6   Company's financial results:

7   *Electricity Operating Statistics*

8   The following table shows certain of the Utility's operating statistics from 2014 to 2016 for electricity sold or delivered, including the classification of revenues by type of service.   No single customer of the Utility accounted for 10% or more of consolidated revenues for electricity sold in 2016, 2015 and 2014.

| | 2016 | 2015 | 2014 |
|---|---|---|---|
| Customers (average for the year) | 5,349,691 | 5,311,178 | 5,276,025 |
| Deliveries (in GWh) [1] | 83,017 | 85,860 | 86,303 |
| Revenues (in millions): | | | |
| Residential | $    5,409 | $    5,032 | $    4,784 |
| Commercial | 5,396 | 5,278 | 5,141 |
| Industrial | 1,525 | 1,555 | 1,543 |
| Agricultural | 1,226 | 1,233 | 1,172 |
| Public street and highway lighting | 80 | 83 | 79 |
| Other [2] | (68) | (84) | (172) |
| Subtotal | 13,568 | 13,097 | 12,547 |
| Regulatory balancing accounts [3] | 297 | 560 | 1,109 |
| **Total operating revenues** | $    13,865 | $    13,657 | $    13,656 |
| Selected Statistics: | | | |
| Average annual residential usage (kWh) | 6,115 | 6,294 | 6,458 |
| Average billed revenues per kWh: | | | |
| Residential | $    0.1887 | $    0.1719 | $    0.1603 |
| Commercial | 0.1716 | 0.1640 | 0.1585 |
| Industrial | 0.0990 | 0.0973 | 0.0998 |
| Agricultural | 0.1814 | 0.1610 | 0.1516 |
| Net plant investment per customer | $    7,195 | $    6,660 | $    6,339 |

[1] These amounts include electricity provided to direct access customers and CCAs who procure their own supplies of electricity.
[2] This activity is primarily related to a remittance of revenue to the Department of Water Resources ("DWR") (the Utility acts as a billing and collection agent on behalf of the DWR), partially offset by other miscellaneous revenue items.
[3] These amounts represent revenues authorized to be billed.

17         86.    Moreover, the March 2017 Registration Statement stated that the Company had taken

18   proper precautions throughout 2016 to deal with the risks of climate change, including "wildfire

19   risk," such as the formation of an officer-level coordinating committee, conducting a regular review

20   of the "most relevant scientific literature," the identification of climate-related risks, the

21   development of "necessary adaption strategies," and the maintenance of plans and procedures to

22   address the risk of wildfires.   It stated in pertinent part:

23         *Climate Change Mitigation and Adaptation Strategies.* ***During 2016, the***
   ***Utility continued its programs to develop strategies to mitigate the impact of the***
24   ***Utility's operations (including customer energy usage) on the environment and to***
   ***plan for the actions that it will need to take to adapt to the likely impacts of climate***
25   ***change on the Utility's future operations, including forming an officer-level***
   ***coordinating committee to govern and oversee the Utility's activities.  The Utility***
26   ***regularly reviews the most relevant scientific literature on climate change such as***
   ***sea level rise, temperature changes, rainfall and runoff patterns, and wildfire risk,***
27   ***to help the Utility identify and evaluate climate change-related risks and develop***
   ***the necessary adaptation strategies.  The Utility maintains emergency response***
28   ***plans and procedures to address a range of near-term risks, including extreme***

*storms, heat waves and wildfires and uses its risk-assessment process to prioritize infrastructure investments for longer-term risks associated with climate change.* The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future.

87.     The March 2017 Registration Statement also represented that the Utility had made substantial improvements in its electrical transmission and distribution equipment during 2016 to "improve maintenance and system flexibility, reliability and safety." It stated in pertinent part:

*Electricity Transmission*

At December 31, 2016, the Utility owned approximately 18,400 circuit miles of interconnected transmission lines operating at voltages ranging from 60 kV to 500 kV. The Utility also operated 92 electric transmission substations with a capacity of approximately 64,600 MVA. The Utility's electric transmission system is interconnected with electric power systems in the Western Electricity Coordinating Council, which includes many western states, Alberta and British Columbia, and parts of Mexico.

\*       \*       \*

***Throughout 2016, the Utility upgraded several critical substations and re-conducted a number of transmission lines to improve maintenance and system flexibility, reliability and safety. The Utility expects to undertake various additional transmission projects over the next several years to upgrade and expand the capacity of its transmission system to secure access to renewable generation resources and replace aging or obsolete equipment and improve system reliability. The Utility also has taken steps to improve the physical security of its transmission substations and equipment.***

*Electricity Distribution*

The Utility's electricity distribution network consists of approximately 142,000 circuit miles of distribution lines (of which approximately 20% are underground and approximately 80% are overhead), 59 transmission switching substations, and 606 distribution substations, with a capacity of approximately 31,800 MVA. The Utility's distribution network interconnects with its transmission system, primarily at switching and distribution substations, where equipment reduces the high-voltage transmission voltages to lower voltages, ranging from 44 kV to 2.4 kV, suitable for distribution to the Utility's customers.

These distribution substations serve as the central hubs for the Utility's electric distribution network. Emanating from each substation are primary and secondary distribution lines connected to local transformers and switching equipment that link distribution lines and provide delivery to end-users. In some cases, the Utility sells electricity from its distribution facilities to entities, such as municipal and other utilities, that resell the electricity. ***In 2016 the Utility commenced operations in a new electric distribution control center facility in Concord, California; along with the existing distribution control centers in Rocklin and Fresno, California, these control centers form a key part of the Utility's efforts to create a smarter, more resilient grid.***

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933                    - 23

*In 2016, the Utility continued to deploy its Fault Location, Isolation, and Service Restoration circuit technology which involves the rapid operation of smart switches to reduce the duration of customer outages.  Another 89 circuits were outfitted with this equipment, bringing the total deployment to 789 of the Utility's 3,200 distribution circuits.  The Utility plans to continue performing work to improve the reliability and safety of its electricity distribution operations in 2017.*

88.     The March 2017 Registration Statement also provided an update on litigation against the Company stemming from the Butte fire, yet it failed to disclose that this fire was not an isolated incident but one of hundreds of fires being ignited by PG&E's pattern and practice of failing to properly maintain its equipment throughout its service areas.  Instead, the March 2017 Registration Statement provided the Utility's denial that its negligence had caused the blaze, stating: "***The Utility believes it was not negligent*** . . . ."  In addition, the March 2017 Registration Statement stated that, while the estimated costs for the fire had grown, these costs remained relatively modest as compared to the Company's revenues and insurance coverage.  For example, it stated that estimated losses attributable to the fire were $750 million (compared to the Company's 2016 consolidated revenues of over $17 billion), and that the Utility "plans to seek recovery of all insured losses" and "has liability insurance from various insurers, which provides coverage for third-party liability attributable to the Butte fire in an aggregate amount of approximately $900 million."  It continued: "In addition, the Utility is pursuing coverage under the insurance policies of its two vegetation management contractors, including under policies where the Utility is listed as an additional insured."

89.     The statements in ¶¶84-88 were materially false and misleading when made because they failed to disclose the adverse facts listed in ¶72, which existed at the time of the March 2017 Notes Offering and rendered PG&E's financial results and its representations regarding its business and prospects included in the March 2017 Registration Statement materially misleading.

90.     Moreover, the failure of the March 2017 Registration Statement to disclose that PG&E had systematically violated California regulations regarding fire prevention and failed to take reasonable steps to mitigate fire dangers violated Item 303, because these undisclosed facts were known to PG&E and would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations.  This failure also violated Item 503 because these specific

1    risks were not adequately disclosed, or disclosed at all, even though they were some of the most

2    significant factors that made an investment in PG&E notes speculative or risky.

3    **Events Following the March 2017 Notes Offering**

4          91.    Beginning in early October 2017, a series of wildfires broke out that devastated much

5    of northern California.  These fires would become known as the "Northern California Fires," and

6    quickly grew into the costliest wildfires on record up until that time, burning at least 245,000 acres

7    and causing over $13 billion in damages.  At the time, the causes for the fires were not known,

8    although the confluence of abnormally high winds and dry conditions were reported as possible

9    causes.  Cal Fire launched an investigation into the fires to determine the probable causes and

10   reasons for the extent and severity of the blazes.

11         92.    On November 2, 2017, PG&E held a third quarter earnings call with investors, during

12   which, among other topics, the Northern California Fires were discussed.  During the call, PG&E

13   Corporation CEO G. Williams highlighted the "extraordinary nature of the weather condition" that

14   preceded the fires, which she called "without precedent."  As to the potential financial impact to the

15   Company, she stated: "At this time, the known financial impact of the wildfires is limited to the cost

16   of the unprecedented response and restoration efforts, costs related to our liability insurance and

17   some legal expenses . . . ."  PG&E did not disclose the Company's pattern and practice of

18   disregarding applicable safety regulations, lax wildfire practices, and active role in causing hundreds

19   of fires.  Instead, defendant G. Williams highlighted the potential invocation of the inverse

20   condemnation doctrine, which she stated applies "***even if a utility has followed all the rules and, in***

21   ***essence, has not done anything wrong***."  She continued by stating that it was too early to assign

22   liability and emphasizing the Company's role in rebuilding devastated California communities,

23   stating in pertinent part:

24            That said, I want to be clear. ***This was an extraordinary confluence of events
     and right now, it's simply too early to make an assumption about liability. What we***

25   ***can say with certainty is that PG&E is going to be crucial to the rebuilding and
     recovery in the communities affected, and we are committed to supporting that***

26   ***process***. We've pledged more than $3 million to help support the community's
     recovery efforts, and we are matching our employees' charitable contributions for

27   wildfire relief. Employees from across the company have stepped up to volunteer
     their time to support the affected communities, and we'll be doing much more in the

28   weeks and the months ahead.

93.   Later in the call, defendant G. Williams would again stressed that, "*[o]n the topic of liability, as we've said, it's premature to discuss any potential liability for the recent wildfires, given that there has been no determination of the causes of any of the fires.*"

94.   During the conference call, defendant G. Williams also represented that the Company exceeded industry best practices in terms of vegetation management. She stated in pertinent part:

> I know there's a lot of interest in our pole maintenance and vegetation management programs, so let me address these as well. First, we routinely inspect, maintain and replace our electric poles. This includes annual scheduled patrols, 5-year visual inspections, an intrusive testing and treating on our wood poles on a frequency that significantly exceeds CPUC requirements.
>
> **We also have one of, if not, the most comprehensive vegetation management programs in the country.** Our vegetation management program manages about 123 million trees across the service territory.  And every year, we inspect every segment of the 99,000 miles of overhead line and we clear vegetation as needed. This is well beyond what is typical in our industry where most utilities have a 3-year vegetation management cycle or sometimes longer. Typically, we spend about $200 million every year to line clear or remove 1.3 million trees to mitigate both the risk of wildfires and to prevent electric outages. With the drought and the tree mortality crisis we've experienced in California, we have been expanding our vegetation management work since 2014.
>
> In 2016, we spent an additional $200 million, essentially doubling our typical vegetation management spending last year. We've removed an incremental 236,000 dead or dying trees, and we enhanced our tree maintenance work with additional patrols in areas of high fire danger, including a combination of boots on the ground, aerial patrols, and sophisticated LiDAR technology.

95.   During the call, COO Stavropoulos reiterated PG&E's purportedly high standard with respect to vegetation management.  Defendant Stavropoulos stated in pertinent part:

> So as Geisha mentioned, **we have a very aggressive vegetation management program** across our 70,000-mile – square mile territory.  We manage about 123 million trees that are near and adjacent to our facilities.  And over the last 2 years, we've doubled the amount that we've invested in veg management. That includes line clearing to remove parts of trees that are adjacent to our facilities as well as removal of dead and dying trees.  So the program involves year-round effort to identify these dead and dying trees through inspection processes where we use foot and aerial patrols; we use LiDAR, which is light, detecting and ranging technology, to identify the trees that need to be worked. We inspect all of our overhead lines every year, and we do second patrols in high fire danger areas at least twice a year. In some areas, we do as often as 4x a year. **So it's a very aggressive program**.  There are specific requirements around line clearing, and it depends upon the voltage of the lines.  And it can range up to feet to as much a sort of 18 inches away from the facility. So there are all sorts of different requirements, depending upon where the facilities are located and the voltage of the facilities.

1    96.    On November 3, 2017, PG&E issued a "Business Update" in the form of a slide

2    presentation that it stated would be used "in meetings with institutional investors and analysts and at

3    investor conferences." The slide presentation stated that "*Safety Forms the Foundation of*

4    *Operational and Financial Success*" at the Company, which had "*[d]emonstrated [PG&E's]*

5    *commitment to safety and compliance at all levels*." Examples of PG&E's foundation of safety

6    provided in the presentation were the Company's purported leadership, transparency, safety-based

7    incentive structured and the "embrace[ of] a continuous improvement mindset and speak-up culture."

8    97.    The statements identified in ¶¶92-96 regarding PG&E's purported wildfire risk

9    prevention practices remained alive in the market and uncorrected at the time of the April 2018

10   Notes Offering.

11   **The April 2018 Notes Offering**

12   98.    On or about April 13, 2018, PG&E filed a prospectus supplement for the April 2018

13   Notes Offering on Form 424B3, which formed part of a registration statement filed on Form S-4 on

14   April 2, 2018, for the exchange of publicly tradable registered notes for restricted notes that PG&E

15   had previously sold in a private placement to qualified institutional investors (the "April 2018

16   Registration Statement").   The April 2018 Registration Statement explicitly incorporated the

17   Company's Form 10-K for the fiscal year ended December 31, 2017, which formed part of the April

18   2018 Registration Statement.  Defendants offered and sold up to $500 million worth of floating rate

19   PG&E senior notes due November 28, 2018, $1.15 billion worth of 3.30% PG&E senior notes due

20   December 1, 2027, and $850 million worth of 3.95% PG&E senior notes due December 1, 2047

21   pursuant to the April 2018 Registration Statement.

22   99.    The April 2018 Registration Statement was negligently prepared and, as a result,

23   contained untrue statements of material fact, omitted material facts necessary to make the statements

24   contained therein not misleading, and failed to make adequate disclosures required under the rules

25   and regulations governing the preparation of such documents.

26   100.    The April 2018 Registration Statement contained many substantially similar

27   materially false and misleading statements as those contained in the March 2016 Registration

28   Statement, the December 2016 Registration Statement and the March 2017 Registration Statement

identified in ¶¶63-71, including, *inter alia*, the statements that "the ***Utility's vegetation management activities will continue to play an important role to help reduce the risk of wildfire and its impact on electric and gas facilities***" and that "***[t]he Utility is making substantial investments to build a more modern and resilient system that can better withstand extreme weather and related emergencies***."

101.    In addition, the April 2018 Registration Statement highlighted the more than $13.2 billion in revenues derived from the Company's electricity segment for fiscal 2017 and provided the following table of the Company's financial results:

*Electricity Operating Statistics*

The following table shows certain of the Utility's operating statistics from 2015 to 2017 for electricity sold or delivered, including the classification of revenues by type of service.  No single customer of the Utility accounted for 10% or more of consolidated revenues for electricity sold in 2017, 2016 and 2015.

| | 2017 | 2016 | 2015 |
|---|---|---|---|
| Customers (average for the year) | 5,384,525 | 5,349,691 | 5,311,178 |
| Deliveries (in GWh) (1) | 82,226 | 83,017 | 85,860 |
| Revenues (in millions): | | | |
| Residential | $ 5,693 | $ 5,409 | $ 5,032 |
| Commercial | 5,431 | 5,396 | 5,278 |
| Industrial | 1,603 | 1,525 | 1,555 |
| Agricultural | 1,069 | 1,226 | 1,233 |
| Public street and highway lighting | 79 | 80 | 83 |
| Other (2) | (294) | (68) | (84) |
| Subtotal | 13,581 | 13,568 | 13,097 |
| Regulatory balancing accounts (3) | (344) | 297 | 560 |
| Total operating revenues | $ 13,237 | $ 13,865 | $ 13,657 |
| Selected Statistics: | | | |
| Average annual residential usage (kWh) | 6,231 | 6,115 | 6,294 |
| Average billed revenues per kWh: | | | |
| Residential | $ 0.1936 | $ 0.1887 | $ 0.1719 |
| Commercial | 0.1716 | 0.1716 | 0.1640 |
| Industrial | 0.1055 | 0.0990 | 0.0973 |
| Agricultural | 0.2041 | 0.1814 | 0.1610 |
| Net plant investment per customer | $ 7,486 | $ 7,195 | $ 6,660 |

(1) These amounts include electricity provided to direct access customers and CCAs who procure their own supplies of electricity.
(2) This activity is primarily related to provisions for rate refunds and unbilled electric revenue, partially offset by other miscellaneous revenue items.
(3) These amounts represent revenues authorized to be billed.

102.    The April 2018 Registration Statement discussed the risk that wildfires could adversely impact the Company's financial results, but did so in the context of boilerplate risk disclosures about *force majeure* events, such as "acts of terrorism" and "war," stating in pertinent part:

> Some of the factors that could cause future results to differ materially from those expressed or implied by the forward-looking statements, or from historical results, include, but are not limited to:
>
> *                *                *
>
> •       ***the impact of wildfires, droughts, floods, or other weather-related conditions or events, climate change, natural disasters, acts of terrorism, war, vandalism (including cyber-attacks), downed power lines, and other events***, that can cause unplanned outages, reduce generating output, disrupt the Company's service to customers, or damage or disrupt the facilities, operations, or information technology and systems owned by the Company,

1  its customers, or third parties on which the Company relies, and the
2  reparation and other costs that the Company may incur in connection with
   such conditions or events; the impact of the adequacy of the Company's
3  emergency preparedness; whether the Company incurs liability to third
   parties for property damage or personal injury caused by such events;
4  whether the Company is subject to civil, criminal, or regulatory penalties in
   connection with such events; and whether the Company's insurance coverage
5  is available for these types of claims and sufficient to cover the Company's
   liability; [and]

6  • ***the breakdown or failure of equipment that can cause fires and unplanned
     outages; and whether the Company will be subject to investigations,***
7    ***penalties, and other costs in connection with such events*** . . . .

8      103.  The April 2018 Registration Statement also discussed the Northern California Fires,

9  including "***whether*** the Company ***may have liability associated with these fires***" (which, of course,

10  implied that the Company may have no liability, let alone responsibility, for the fires), but failed to

11  disclose that PG&E's failure to properly maintain its equipment was ***already*** igniting hundreds of

12  fires annually and that the Company's widespread failure to follow California safety regulations was

13  a ***primary cause*** of the Northern California Fires and such conduct posed a substantial likelihood of

14  igniting even more destructive blazes.  It stated in pertinent part:

15  ***[T]he impact of the Northern California wildfires, including the costs of
    restoration of service to customers and repairs to the Company facilities, and***
16  ***whether the Company is able to recover such costs through a Catastrophic Event
    Memorandum Account; the timing and outcome of the wildfire investigations,***
17  ***including into the causes of the wildfires; whether the Company may have liability
    associated with these fires***; if liable for one or more fires, whether the Company
18  would be able to recover all or part of such costs through insurance or through
    regulatory mechanisms, to the extent insurance is not available or exhausted; and
19  potential liabilities in connection with fines or penalties that could be imposed on the
    Company if the California Department of Forestry and Fire Protection and the
20  California Public Utilities Commission ("CPUC") or any other law enforcement
    agency brought an enforcement action and determined that the Company failed to
21  comply with applicable laws and regulations . . . .

22      104.  While the April 2018 Registration Statement stated that PG&E "***could*** be liable for

23  property damage, interest, and attorneys' fees without having been found negligent" "***[i]f*** the

24  Utility's facilities, such as its electric distribution and transmission lines, are determined to be the

25  cause of one or more fires, and the doctrine of inverse condemnation applies," it stressed that

26  ***"[g]iven the preliminary stages of investigations and the uncertainty as to the causes of the fires,***

27  ***PG&E Corporation and the Utility do not believe a loss is probable at this time***." Furthermore, the

28  April 2018 Registration Statement stated that while additional facts "could emerge" rendering a loss

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933                                    - 29 -

1   probable, "[t]he Utility has liability insurance from various insurers, which provides coverage for

2   third-party liability attributable to the Northern California Fires in an aggregate amount of

3   approximately $800 million" and could also "apply for cost recovery" through regulatory

4   mechanisms.

5          105.    As to the Butte fire, the April 2018 Registration Statement mentioned the relatively

6   *de minimis* $8.3 million in citations issued by the CPUC Safety and Enforcement Division for poor

7   tree maintenance and reporting failures in connection with the fire, and discussed risks related to

8   "the timing and outcome of the Butte fire litigation [and] the timing and outcome of any proceeding

9   to recover costs in excess of insurance from customers, if any."  Again, the April 2018 Registration

10  Statement failed to disclose PG&E's pattern of lax wildfire practices and widespread failure to

11  appropriately maintain its electrical lines and the role that these Company-wide deficiencies had

12  played in both the Butte fire and the Northern California Fires and the ongoing risks they posed to

13  the Company's business and prospects.

14         106.    Instead, the April 2018 Registration Statement provided the Utility's denial that its

15  negligence had caused the Butte fire, stating: "***[T]he Utility believes it was not negligent***."   In

16  addition, the April 2018 Registration Statement stated that, while the estimated costs for the fire had

17  grown, these costs remained relatively modest as compared to the Company's revenues and

18  insurance coverage. For example, it stated that estimated losses attributable to the fire were $1.1

19  billion (compared to the Company's 2017 consolidated revenues of over $17 billion), and that "the

20  Utility plans to seek recovery of all insured losses" and "has liability insurance from various

21  insurers, which provides coverage for third-party liability attributable to the Butte fire in an

22  aggregate amount of $922 million."  It also stated that the Utility had "received $53 million of

23  reimbursements from the insurance policies of one of its vegetation management contractors" during

24  2017.

25         107.    The April 2018 Registration Statement highlighted PG&E's "application to establish

26  a Wildfire Expense Memorandum Account ('WEMA') to track wildfire expenses and to preserve the

27  opportunity for the Company to request recovery of wildfire costs in excess of insurance at a future

28  date, and the outcome of any potential request to recover such costs."  Similarly, it stated that

PG&E's future financial performance could be impacted by "the extent to which the Company is able to recover environmental costs in rates or from other sources" and that, following the Northern California Fires, it had "incurred $219 million in costs for service restoration and repair to the Utility's facilities (including $97 million in capital expenditures) through December 31, 2017 in connection with these fires," which it believed "are recoverable through CEMA [Catastrophic Event Memorandum Account]."  It continued in pertinent part:

> On July 26, 2017, the Utility filed an application with the CPUC requesting to establish a WEMA to track wildfire expenses and to preserve the opportunity for the Utility to request recovery of wildfire costs in excess of insurance at a future date. Concurrently with this application, the Utility also submitted a motion to the CPUC requesting that the WEMA be deemed effective as of July 26, 2017, such that the Utility may begin recording costs to the account while the application is pending before the CPUC.
>
> **Under the WEMA as proposed, the Utility would record costs related to wildfires, including: (1) payments to satisfy wildfire claims, including any deductibles, co-insurance and other insurance expense paid by the Utility but excluding costs that have already been authorized in the Utility's GRC; (2) outside legal costs incurred in the defense of wildfire claims; (3) premium costs not in rates; and (4) the cost of financing these amounts. Insurance proceeds, as well as any payments received from third parties, would be credited to the WEMA as they are received.** The WEMA would not include the Utility's costs for fire response and infrastructure costs which are tracked in CEMA.

These representations further suggested that the wildfires were not part of a larger pattern and practice at the Company, and that the financial implications of any findings that implicated PG&E as a source of the Butte fire or the Northern California Fires would be mitigated by insurance proceeds and PG&E's ability to raise rates for electricity.

108.  Moreover, the April 2018 Registration Statement highlighted the impacts of climate change and severe weather events on wildfire risk, but did not mention PG&E's pattern and practice of ignoring wildfire safety regulations as a key contributor to the risk of wildfires.  For example, it stated that "inconsistent and extreme precipitation" had increased the wildfire risk in the Company's service area and represented that PG&E was "developing contingency plans to adapt to those events."  The April 2018 Registration Statement pertinent part:

> **Severe weather conditions, extended drought and shifting climate patterns could materially affect PG&E Corporation's and the Utility's business, financial condition, results of operations, liquidity, and cash flows.**

Extreme weather, extended drought and shifting climate patterns have intensified the challenges associated with wildfire management in California. Environmental extremes, such as drought conditions followed by periods of wet weather, can drive additional vegetation growth (which then fuel any fires) and influence both the likelihood and severity of extraordinary wildfire events. *In California, over the past five years, inconsistent and extreme precipitation, coupled with more hot summer days, have increased the wildfire risk and made wildfire outbreaks increasingly difficult to manage. In particular, the risk posed by wildfires has increased in the Utility's service area (the Utility has approximately 82,000 distribution overhead circuit miles and 18,000 transmission overhead circuit miles) as a result of an extended period of drought, bark beetle infestations in the California forest and wildfire fuel increases due to record rainfall following the drought, among other environmental factors*. Other contributing factors include local land use policies and historical forestry management practices. The combined effects of extreme weather and climate change also impact this risk.

* * *

*Further, the Utility has been studying the potential effects of climate change (increased temperatures, changing precipitation patterns, rising sea levels) on the Utility's operations and is developing contingency plans to adapt to those events and conditions that the Utility believes are most significant*. Scientists project that climate change will increase electricity demand due to more extreme, persistent and hot weather. As a result, the Utility's hydroelectric generation could change and the Utility would need to consider managing or acquiring additional generation. If the Utility increases its reliance on conventional generation resources to replace hydroelectric generation and to meet increased customer demand, it may become more costly for the Utility to comply with GHG emissions limits. In addition, flooding caused by rising sea levels could damage the Utility's facilities, including generation and electric transmission and distribution assets. The Utility could incur substantial costs to repair or replace facilities, restore service, or compensate customers and other third parties for damages or injuries. The Utility anticipates that the increased costs would be recovered through rates, but as rate pressures increase, the likelihood of disallowance or non-recovery may increase.

109.   Moreover, the April 2018 Registration Statement stated that the Company had taken proper precautions throughout 2017 to "continue[] its programs to mitigate" the impacts of climate change, including wildfire risks, such as strategic initiatives with the CPUC, conducting a regular review of the "most relevant scientific literature," the identification of climate-related risks, the development of necessary "adaptation strategies," and the maintenance of plans and procedures to address the risk of wildfires. It stated in pertinent part:

*Climate Change Resilience Strategies*

*During 2017, the Utility continued its programs to mitigate the impact of the Utility's operations (including customer energy usage) on the environment and to plan for the actions that it will need to take to increase its resilience in light of the likely impacts of climate change on the Utility's operations*. The Utility regularly reviews the most relevant scientific literature on climate change such as rising sea levels, major storm events, increasing temperatures and heatwaves,

wildfires, drought and land subsidence, to help the Utility identify and evaluate climate change-related risks and develop the necessary resilience strategies. The Utility maintains emergency response plans and procedures to address a range of near-term risks, including wildfires, extreme storms, and heat waves and uses its risk-assessment process to prioritize infrastructure investments for longer-term risks associated with climate change. The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future.

The Utility is working to better understand the current and future impacts of climate change. In 2017, the Utility filed its first RAMP submittal with the CPUC, which examined Utility safety risks. The Climate Resilience RAMP model indicated potential additional Utility safety consequences due to climate change, including in the near term. The Utility is conducting foundational work to help anticipate and plan for evolving conditions in terms of weather and climate-change related events. This work will guide efforts to design a Utility-wide climate change risk integration strategy. This strategy will inform resource planning and investment, operational decisions, and potential additional programs to identify and pursue mitigations that will incorporate the resilience and safety of the Utility's assets, infrastructure, operations, employees, and customers.

110. Similarly, the April 2018 Registration Statement stated that the Utility was developing "effective strategies for adapting to the expected changes in demand for electricity" due to climate change and "making substantial investments to build a more modern and resilient system that can better withstand extreme weather and related emergencies," which included "vegetation management activities" that will purportedly "continue to play an important role to help reduce the risk of wildfire." It stated in pertinent part:

With respect to electric operations, climate scientists project that, sometime in the next several decades, climate change will lead to increased electricity demand due to more extreme, persistent, and frequent hot weather. *The Utility believes its strategies to reduce GHG emissions through energy efficiency and demand response programs, infrastructure improvements, and the use of renewable energy and energy storage are effective strategies for adapting to the expected changes in demand for electricity. The Utility is making substantial investments to build a more modern and resilient system that can better withstand extreme weather and related emergencies*. Over the long-term, the Utility also faces the risk of higher flooding and inundation potential at coastal and low elevation facilities due to sea level rise combined with high tides, storm runoff and storm surges. *As the state continues to face increased risk of wildfire, the Utility's vegetation management activities will continue to play an important role to help reduce the risk of wildfire and its impact on electric and gas facilities*.

111. The April 2018 Registration Statement also represented that the Utility had made substantial improvements in its electrical transmission and distribution equipment during 2017 to "improve maintenance and system flexibility, reliability and safety." It stated in pertinent part:

*Electricity Transmission*

At December 31, 2017, the Utility owned approximately 19,200 circuit miles of interconnected transmission lines operating at voltages ranging from 60 kV to 500 kV.  The Utility also operated 92 electric transmission substations with a capacity of approximately 64,700 MVA.   The Utility's electric transmission system is interconnected with electric power systems in the Western Electricity Coordinating Council, which includes many western states, Alberta and British Columbia, and parts of Mexico.

\*       \*       \*

*Throughout 2017, the Utility upgraded several substations and re-conductored a number of transmission lines to improve maintenance and system flexibility, reliability and safety.  The Utility expects to undertake various additional transmission projects over the next several years to upgrade and expand the capacity of its transmission system to secure access to renewable generation resources and replace aging or obsolete equipment and improve system reliability. The Utility also has taken steps to improve the physical security of its transmission substations and equipment*.

*Electricity Distribution*

The Utility's electric distribution network consists of approximately 107,200 circuit miles of distribution lines (of which approximately 20% are underground and approximately 80% are overhead), 59 transmission switching substations, and 605 distribution substations, with a capacity of approximately 31,800 MVA.   The Utility's distribution network interconnects with its transmission system, primarily at switching and distribution substations, where equipment reduces the high-voltage transmission voltages to lower voltages, ranging from 44 kV to 2.4 kV, suitable for distribution to the Utility's customers.

These distribution substations serve as the central hubs for the Utility's electric distribution network.  Emanating from each substation are primary and secondary distribution lines connected to local transformers and switching equipment that link distribution lines and provide delivery to end-users.  In some cases, the Utility sells electricity from its distribution facilities to entities, such as municipal and other utilities, that resell the electricity.  The Utility operates electric distribution control center facilities in Concord, Rocklin, and Fresno, California; these control centers form a key part of the Utility's efforts to create a smarter, more resilient grid.

*In 2017, the Utility continued to deploy its fault location, isolation, and service restoration circuit technology that involves the rapid operation of smart switches to reduce the duration of customer outages.  Another 92 circuits were outfitted with this equipment, bringing the total deployment to 882 of the Utility's 3,200 distribution circuits.  The Utility plans to continue performing work to improve the reliability and safety of its electric distribution operations in 2018*.

112.     Similarly, the April 2018 Registration Statement stated that the Utility had retained a third-party monitor to help ensure it took appropriate steps to maintain the safety of its electrical operations and promoted a culture of safety and compliance throughout its operations.  It stated in pertinent part:

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933                                    - 34 -

1

*Third-party monitor*

2

On April 12, 2017, the Utility retained a third-party monitor at the Utility's expense as part of its compliance with the sentencing terms of the Utility's January 27, 2017 federal criminal conviction, which sentenced the Utility to, among other things, a five-year corporate probation period and oversight by a third-party monitor for a period of five years, with the ability to apply for early termination after three years. ***The goal of the monitor is to help ensure that the Utility takes reasonable and appropriate steps to maintain the safety of its gas and electric operations and maintains effective ethics, compliance, and safety related incentive programs on a Utility-wide basis***.

3

4

5

6

7

113.   The April 2018 Registration Statement also described the robust regulatory

8

requirements that the Utility was subject to "relating to the protection of the environment and the

9

safety and health of the Utility's personnel and the public," and that it had incurred "significant"

10

costs complying with applicable laws and regulations, but failed to disclose the Utility's pattern and

11

practice of circumventing regulations for the proper maintenance of electrical lines and the

12

mitigation of wildfire risks.  It stated in pertinent part:

13

**Environmental Regulation**

14

***The Utility's operations are subject to extensive federal, state and local laws and requirements relating to the protection of the environment and the safety and health of the Utility's personnel and the public***.  These laws and requirements relate to a broad range of activities, including the remediation of hazardous and radioactive substances; the discharge of pollutants into the air, water, and soil; the reporting and reduction of carbon dioxide $CO_2$ and other GHG emissions; the transportation, handling, storage and disposal of spent nuclear fuel; and the environmental impacts of land use, including endangered species and habitat protection. The penalties for violation of these laws and requirements can be severe and may include significant fines, damages, and criminal or civil sanctions.  These laws and requirements also may require the Utility, under certain circumstances, to interrupt or curtail operations. (See Item 1A. Risk Factors.)  Generally, the Utility recovers most of the costs of complying with environmental laws and regulations in the Utility's rates, subject to reasonableness review.

15

16

17

18

19

20

21

\*       \*       \*

22

***The Utility's operations are subject to extensive environmental laws and changes in or liabilities under these laws could adversely affect PG&E Corporation's and the Utility's financial results***.

23

24

The Utility's operations are subject to extensive federal, state, and local environmental laws, regulations, orders, relating to air quality, water quality and usage, remediation of hazardous wastes, and the protection and conservation of natural resources and wildlife. ***The Utility incurs significant capital, operating, and other costs associated with compliance with these environmental statutes, rules, and regulations***.  The Utility has been in the past, and may be in the future, required to pay for environmental remediation costs at sites where it is identified as a potentially responsible party under federal and state environmental laws.  Although

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933                     - 35

the Utility has recorded liabilities for known environmental obligations, these costs can be difficult to estimate due to uncertainties about the extent of contamination, remediation alternatives, the applicable remediation levels, and the financial ability of other potentially responsible parties.

114.    In particular, the April 2018 Registration Statement highlighted a new regulatory initiative for fire hazard reduction approved by the CPUC that it stated PG&E would "track."  The April 2018 Registration Statement stated in pertinent part:

*Fire Safety OIR*

> **On December 14, 2017, the CPUC approved new regulations to enhance the fire safety of overhead electric transmission and distribution lines located in high fire-threat areas.  This is the culmination of a decade-long effort to improve the fire safety of overhead utility and communication infrastructure across California**.  The SED conferred with Cal Fire, California IOUs, and fire safety professionals, to develop and adopt a statewide fire-threat map.  This map, in conjunction with a United States Forest Service and Cal Fire map of tree mortality high hazard zones, will dictate the application of the new fire safety regulations. ***On January 19, 2018, the CPUC approved the final fire safety map associated with the new regulations***.

> ***The new regulations include increased patrol frequency for overhead facilities, expanded vegetation clearances around powerlines, and give the utilities increased authority to de-energize lines on private property for the removal of trees that pose an immediate threat to fire safety.  The costs associated with the implementation of these new regulations will be tracked in a fire hazard prevention memorandum account and requested for recovery through rates***.

115.    The April 2018 Registration Statement further represented that the Company's costs related to "CEMA fire prevention and vegetation management" had roughly doubled between December 31, 2016 and December 31, 2017, from $223 million to $426 million, respectively.

116.    The statements in ¶¶92-96 and 100-115 were materially false and misleading when made because they failed to disclose the following adverse facts that existed at the time of the April 2018 Notes Offering:

(a)    that PG&E had engaged in a pattern and practice of ignoring California safety regulations and failed to take appropriate measures to mitigate wildfire hazards;

(b)    that PG&E's electrical equipment posed an unreasonable risk of catastrophic loss to those who lived in the Company's service areas due to the Company's failure to follow proper fire prevention measures, such as clearing vegetation, insulating electrical lines, shutting off power during extreme weather events, sufficiently maintaining and inspecting electrical lines and

transmission towers to detect and remedy deficiencies, instilling a corporate safety culture and incentive structure to promote fire safety, properly allocating resources to fire prevention, and other similar measures;

(c)     that PG&E had systematically violated California Public Resources Code §4293, which required the Utility to maintain a minimum distance between trees and other vegetation and electrical transmission lines depending on line voltage, and that such violations had served as a primary cause of several major fires in the Northern California Fires;

(d)     that the Company did not employ industry-leading vegetation management practices, and in fact its practices failed to meet minimum requirements imposed by California law across its operations;

(e)     that PG&E had not materially changed its vegetation management practices following the 2015 Butte fire or the October 2017 Northern California Fires, including by failing to significantly improve its removal of dead and dying trees that posed a serious fire risk because of their proximity to power lines;

(f)     that PG&E had incentivized short-term financial goals, such as the continuation of service even in high-risk weather conditions, at the expense of fire safety and prevention;

(g)     that PG&E had not meaningfully implemented California SB 1028, which required the Utility to develop a comprehensive plan to mitigate fire dangers;

(h)     that PG&E equipment had caused hundreds of fires across California since June 2014, averaging more than one fire a day;

(i)     that the Butte fire was not an isolated incident, but part of a Company-wide pattern and practice of disregard for proper risk mitigation techniques and regulatory requirements that extended throughout the Company's electricity operations; and

(j)     that, as a result of (a)-(i), above, PG&E's financial results and its representations regarding its business and prospects included in the April 2018 Registration Statement were materially misleading.

117.     Moreover, the failure of the April 2018 Registration Statement to disclose that PG&E systematically violated California regulations regarding fire prevention and failed to take reasonable steps to mitigate fire dangers violated Item 303, because these undisclosed facts were known to PG&E and would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations.  This failure also violated Item 503 because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in PG&E notes speculative or risky.

**Events Following the April 2018 Notes Offering**

118.     Following the April 2018 Notes Offering, a series of shocking disclosures began to reveal, for the first time, PG&E's wholesale disregard for California safety regulations, its failure to mitigate wildfire risks (including its failure to take the mitigation measures represented in the offering documents for the Notes Offerings), its history of causing hundreds of wildfires annually throughout California (including its central role in causing the Northern California Fires), and the catastrophic risk of future devastating blazes its conduct posed to California and its residents.

119.     On May 25, 2018, Cal Fire issued a press release announcing the results of its investigation into four of the Northern California Fires.  The agency found that all four had begun as a result of downed vegetation disrupting PG&E power lines, and that three of the four were due to apparent violations of California safety regulations regarding the necessary clearance between trees and power lines.  Cal Fire referred these incidents to the appropriate District Attorney's offices for further review.

120.     On June 8, 2018, Cal Fire issued a press release announcing the results of its investigation into 12 additional wildfires that occurred during the Northern California Fires.  The agency determined that *all 12* were caused by PG&E equipment.  The agency also stated that eight of the 12 had been referred to the appropriate District Attorney's offices for further review "due to evidence of alleged violations of state law."

121.     On June 9, 2018, *Bloomberg* published an article entitled "PG&E May Face Criminal Charges After Probe of Deadly Wildfires."  The article stated that PG&E was exposed to potential

1   criminal liability due to Cal Fire's finding that PG&E's failure to follow the law had led to a

2   majority of the Northern California Fires investigated to date.

3       122.   On June 10, 2018, analysts at Guggenheim issued a research report on PG&E that

4   recommended investors sell PG&E securities.  The report stated: "At this point, we question whether

5   the applicability of inverse condemnation even matters when *all signs seem to point to PCG being*

6   *imprudent operators in the majority of instances, which would therefore mean it should assume*

7   *liability*."

8       123.   On June 21, 2018, PG&E announced that it would take an estimated pre-tax charge in

9   the amount of *$2.5 billion* for the quarter ending June 30, 2018, for claims related to the Northern

10   California Fires.

11      124.   On October 9, 2018, Cal Fire issued a press release announcing the results of its

12   investigation into the Cascade fire, part of the Northern California Fires.  Again, PG&E equipment

13   was found to be the cause of the fire, meaning that *every fire* in the Northern California Fires that

14   had been investigated by Cal Fire up until that time had been attributed to the conduct of PG&E.

15      125.   Then, on November 8, 2018, a wildfire began near the city of Paradise, Butte County,

16   California.  The fire would become known as the "Camp Fire" and grow to surpass the Northern

17   California Fires – *which PG&E equipment had played a central role in igniting only one year*

18   *previously* – as the most destructive and fatal wildfire in California history.  The fire caused at least

19   86 fatalities, with total damages estimated at $16.5 billion.  The fire was considered the costliest

20   natural disaster in the world in 2018.

21      126.   Ultimately, PG&E equipment was implicated as a likely cause of the blaze.

22   Specifically, Cal Fire identified the location of the fire as near a PG&E transmission line, which the

23   Company revealed had relayed and de-energized shortly before the fire began.  A PG&E employee

24   also reported a fire in the vicinity of the transmission line to 911 the morning the Camp Fire started,

25   and an aerial patrol identified a suspension insulator supporting a transposition jump at the

26   transmission tower that had separated.  At the same time, PG&E had canceled plans to shut off

27   power as a precaution against fires in parts of Butte County, where the fire ignited.  Additionally,

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933                                    - 39 -

1   media reports have indicated that a PG&E crew was planning to address sparking transmission lines

2   in a location near the origin of the Camp Fire.

3     127. On November 27, 2018, U.S. District Judge William Alsup of the Northern District of

4   California ordered PG&E to provide written answers to several questions regarding the Company's

5   role in starting the Camp Fire and any other fires in the last three years.  Judge Alsup was presiding

6   over PG&E's probation following its 2016 conviction on six felony counts of knowingly and

7   willfully violating safety standards and obstructing an investigation by the National Transportation

8   Security Board arising out of the explosion of a PG&E gas pipeline in San Bruno, California, that

9   killed eight people and destroyed 38 homes.

10     128. On December 10, 2018, *The San Diego Union-Tribune* reported that PG&E had never

11   produced a report for wildfire mitigation risks two years after the law requiring the production of

12   such a report was enacted.  Under SB 1028 – enacted in September 2016 – PG&E and other

13   California utilities were required to produce an annual report detailing efforts to limit the risks from

14   wildfires and specifying who was responsible for implementing safety provisions in the plans.  State

15   Senator Jerry Hill, who introduced SB 1028, said of utility regulators' failure to oversee PG&E's

16   implementation of the report: "***They have done absolutely nothing in those two years***."

17     129. On December 14, 2018, the CPUC announced that it had opened a case against

18   PG&E for allegedly falsifying its data and safety records. While the documented violations related to

19   the intentional falsification of pipeline data, the agency stated that the findings were an example of

20   why it was "investigating PG&E's safety culture" and considering the forced implementation of

21   measures that "address systemic safety issues at PG&E."   In other words, according to the CPUC,

22   the Company's falsification of pipeline safety data implicated the Company's entire operations and

23   approach to safety.

24     130. On December 28, 2018, the Attorney General of California filed an amicus brief in

25   PG&E's probation case related to the San Bruno pipeline disaster.  The brief, while providing no

26   factual findings, stated that PG&E's actions or failures to act could constitute a range of criminal

27   violations if the Utility was found to be "reckless" in causing California wildfires.  The listed

28   potential offenses ranged from misdemeanors to implied-malice murder.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933     - 40 -

131.   On January 9, 2019, a U.S. probation officer filed a Petition for Summons for Offender Under Supervision, which found "probable cause to believe that Pacific Gas and Electric Company violated the conditions of their Probation" stemming from the San Bruno pipeline explosion.  Specifically, the probation officer cited the Company's failure to report the investigation by the Butte County District Attorney's Office into PG&E's role in starting several fires that formed part of the Northern California Fires.  The probation officer also cited PG&E's failure to report Cal Fire's findings of responsibility for the Honey Fire (part of the Northern California Fires), that there was the possibility of criminal prosecution stemming from PG&E's role in starting this fire, or that the Company had entered into a settlement agreement with Butte County to avoid such criminal prosecution.

132.   That same day, Judge Alsup issued an order to show cause as to why the terms of PG&E's probation should not be modified "[i]n order to protect the public from further wrongs by the offender, to deter similar wrongs by other utilities, and to promote the rehabilitation of the offender."  The order cited Cal Fire's finding that PG&E had caused 18 wildfires in 2017, 12 of which it had referred to criminal prosecution, and suggested the Company significantly bolster its vegetation management activities and re-inspect its entire electrical grid in "light of PG&E's history of falsification of inspection reports," among other proposed modifications to the terms of the Company's probation.[2]

133.   On January 13, 2019, *The Wall Street Journal* reported that PG&E had **started more than 1,500 fires** between June 2014 and December 2017, or more than one a day on average.  The newspaper provided the following graphic, which illustrates the shocking extent of PG&E's contribution to fires throughout California with incidents reported across essentially **all** of the Utility's service area:

---

[2]   Later, Cal Fire would find that PG&E had likely not caused one of the Northern California Fires it had investigated, the Tubbs Fire. Thus, PG&E had been found responsible for at least **18 of the 19 major fires** stemming from the Northern California Fires that Cal Fire had investigated up until that point.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20
21

134.   On January 14, 2019, PG&E filed a current report on Form 8-K stating that the Company expected to file for Chapter 11 bankruptcy on or about January 29, 2019.  The reason the Company provided for the expected bankruptcy filing was the "series of catastrophic wildfires that occurred in Northern California in 2017 and 2018."

135.   On January 17, 2019, Judge Alsup issued a request for comment on his tentative finding that "the single most recurring cause of the large 2017 and 2018 wildfires attributable to PG&E's equipment has been the susceptibility of PG&E's distribution lines to trees or limbs falling onto them during high-wind events."

136.     On January 29, 2019, PG&E declared Chapter 11 bankruptcy.  The Company's bankruptcy filings stated that it was facing nearly $52 billion in liabilities, including more than $30 billion in possible liabilities tied to the Camp Fire and the Northern California Fires.

137.     On January 30, 2019, Judge Alsup held a probationary hearing for PG&E.  During the hearing, Judge Alsup reportedly stated: "***There is one very clear-cut pattern here, and that's that PG&E is starting these fires***."  When Company representatives stated that PG&E had made safety a priority, Judge Alsup reportedly responded: "***It's not really true. Safety is not your No. 1 thing***."

138.     Subsequent to the Notes Offerings, the prices of the senior notes offered and sold therein have declined significantly.  For example, on February 20, 2019, the price of the 2.95% note sold in the March 2016 Notes Offering closed at $82.75 per unit, or ***more than 17% below par***; the price of the 4.00% note sold in the December 2016 Notes Offering closed at $78.75 per unit, or ***more than 21% below par***; the price of the 3.3% note sold in the March 2017 Notes Offering and the price of the 3.3% note sold in the April 2018 Notes Offering closed at $83.63 per unit, or ***more than 16% below par***; and the price of the 3.95% note sold in the April 2018 Notes Offering closed at $77.50 per unit, or ***more than 22% below par***.

**CLASS ACTION ALLEGATIONS**

139.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities that acquired PG&E senior notes in or traceable to one or more of the Notes Offerings.[3]  Excluded from the Class are defendants and their families, the officers, directors and affiliates of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

140.     The members of the Class are so numerous that joinder of all members is impracticable.  PG&E notes are traded on the New York Stock Exchange ("NYSE"), and over $4 billion worth of PG&E notes were sold in the Notes Offerings.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate

---

[3]     The Notes Offerings are the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering.

discovery, plaintiffs believe that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PG&E or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

141. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

142. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

143. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether defendants violated the 1933 Act;

(b) whether statements made by defendants to the investing public in the offering documents for the Notes Offerings misrepresented material facts about the business and operations of PG&E; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

144. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of §11 of the 1933 Act
### Against All Defendants

145. Plaintiffs repeat and reallege ¶¶1-144 by reference.

146.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

147.     This Count does not sound in fraud.  Plaintiffs do not allege that the Individual Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

148.     The registration statements for the Notes Offerings were inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

149.     The Utility, a subsidiary of PG&E Corporation, is the registrant for the senior notes sold in the Notes Offerings.  The Utility and PG&E Corporation would be named as defendants herein for this Count but for their declaration of bankruptcy and the imposition of the automatic bankruptcy stay under federal law.

150.     The defendants named herein were responsible for the contents and dissemination of the registration statements for the Notes Offering.  None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the registration statements for the Notes Offerings were true and without omissions of any material facts and were not misleading.

151.     By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

152.     Plaintiffs acquired PG&E senior notes sold in the Notes Offerings traceable to the registration statements for the Notes Offerings.

153.     Plaintiffs and the Class have sustained damages.

154.     At the time of their purchases of the PG&E notes sold in the Notes Offerings, plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiffs filed this complaint.  Less than three years has elapsed between the time that the

securities upon which this Count is brought were offered to the public and the time plaintiffs filed this complaint.

## COUNT II

### For Violation of §15 of the 1933 Act
### Against the Individual Defendants

155.    Plaintiffs repeat and reallege ¶¶1-154 by reference.

156.    This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants.

157.    The Individual Defendants each were control persons of PG&E by virtue of their positions as directors and/or senior officers of PG&E.  The Individual Defendants oversaw the Notes Offerings, including the preparation and dissemination of the registration statements for the Notes Offerings, and took steps to ensure that the Notes Offerings were successfully completed, including, for example, by signing the registration statements for the Notes Offerings.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Class counsel;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

1

**JURY DEMAND**

2        Plaintiffs hereby demand a trial by jury.

3   DATED:  February 22, 2019                 ROBBINS GELLER RUDMAN
                                                & DOWD LLP
4                                             DARREN J. ROBBINS
                                              BRIAN E. COCHRAN
5

6
                                              _____/s/ Darren J. Robbins_____
7                                                   DARREN J. ROBBINS

8                                             655 West Broadway, Suite 1900
                                              San Diego, CA  92101
9                                             Telephone:  619/231-1058
                                              619/231-7423 (fax)
10                                            darrenr@rgrdlaw.com
                                              bcochran@rgrdlaw.com
11
                                              ROBBINS GELLER RUDMAN
12                                              & DOWD LLP
                                              SHAWN A. WILLIAMS
13                                            Post Montgomery Center
                                              One Montgomery Street, Suite 1800
14                                            San Francisco, CA  94104
                                              Telephone:  415/288-4545
15                                            415/288-4534 (fax)
                                              shawnw.rgrdlaw.com
16
                                              VANOVERBEKE, MICHAUD & TIMMONY, P.C.
17                                            THOMAS C. MICHAUD
                                              79 Alfred Street
18                                            Detroit, MI  48201
                                              Telephone:  313/578-1200
19                                            313/578-1201 (fax)
                                              tmichaud@vmtlaw.com
20
                                              Attorneys for Plaintiffs
21

22   I:\Admin\CptDraft\Securities\Cpt PG&E bonds.docx

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933                  - 47 -

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

York County on behalf of the County of York Retirement Fund ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 22nd day of February, 2019.

York County on behalf of the County of York Retirement Fund

By: _____
Gregory F. Bower, Secretary

PG&E

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Bond**

| Date Acquired | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 05/03/2018 | 2.95% due 03/01/2026 | 112,000 | $92.16 |
| 05/30/2018 | 2.95% due 03/01/2026 | 212,000 | $91.95 |
| 11/27/2017 | 3.3% due 12/01/2027 | 162,000 | $99.70 |
| 11/27/2017 | 3.3% due 12/01/2027 | 162,000 | $99.99 |
| 05/14/2018[e] | 3.3% due 12/01/2027 | 212,000 | $92.51 |

| Date Sold | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 11/15/2018 | 2.95% due 03/01/2026 | 25,000 | $80.00 |
| 11/15/2018 | 2.95% due 03/01/2026 | 25,000 | $81.00 |
| 11/15/2018 | 2.95% due 03/01/2026 | 46,000 | $79.92 |
| 11/15/2018 | 2.95% due 03/01/2026 | 64,000 | $81.63 |
| 11/15/2018 | 2.95% due 03/01/2026 | 64,000 | $82.25 |
| 11/16/2018 | 2.95% due 03/01/2026 | 38,000 | $87.00 |
| 01/09/2019 | 2.95% due 03/01/2026 | 62,000 | $79.00 |
| 05/03/2018 | 3.3% due 12/01/2027 | 112,000 | $92.92 |
| 05/14/2018[e] | 3.3% due 12/01/2027 | 212,000 | $92.51 |
| 05/30/2018 | 3.3% due 12/01/2027 | 212,000 | $92.73 |

[e]Debt exchange offer.

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.     (a)     Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*None.*

(b)     Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*City of Warren Police and Fire Retirement System v. DXC Technology*, No. 1:18-cv-01599 (E.D. Va.)
*Atansio v. Tenaris S.A., et al.*, No. 1:18-cv-07059 (E.D.N.Y.)

(c)     Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*City of Warren Police and Fire Retirement System v. Zebra Technologies*, No. 2:17-cv-4412 (E.D.N.Y.)
*City of Warren Police and Fire Retirement System v. TransDigm Group*, No. 1:17-cv-01677 (N.D. Ohio)
*City of Warren Police and Fire Retirement System v. Foot Locker, Inc.*, No. 1:18-cv-01492 (E.D.N.Y.)
*City of Warren Police and Fire Retirement System v. Hasbro, Inc.*, No. 1:18-cv-00543 (D.R.I.)

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of February, 2019.

CITY OF WARREN POLICE AND FIRE
RETIREMENT SYSTEM

By: _____

Its: _____
Chairperson

PG&E

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Bond**

| Date<br>Acquired | Type of<br>Debt | Face<br>Amount | Price |
|---|---|---|---|
| 12/21/2017 | 3.3% due 12/01/2027 | 75,000 | $98.89 |
| 05/01/2018 | 3.3% due 12/01/2027 | 25,000 | $93.09 |
| 05/14/2018[e] | 3.3% due 12/01/2027 | 100,000 | $92.51 |

| Date<br>Sold | Type of<br>Debt | Face<br>Amount | Price |
|---|---|---|---|
| 05/14/2018[e] | 3.3% due 12/01/2027 | 100,000 | $92.51 |
| 01/14/2019 | 3.3% due 12/01/2027 | 100,000 | $78.00 |

[e]Debt exchange offer.

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

MID-JERSEY TRUCKING INDUSTRY & LOCAL NO. 701 PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21ˢᵗ day of February, 2019.

MID-JERSEY TRUCKING INDUSTRY &
LOCAL NO. 701 PENSION FUND

By: _____
Giancarlo Prezioso, Administrator

PG&E

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Bond**

| Date Acquired | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 12/22/2017 | 3.3% due 03/15/2027 | 65,000 | $98.80 |
| 01/31/2018 | 4.0% due 12/01/2046 | 20,000 | $97.97 |

| Date Sold | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 01/14/2019 | 3.3% due 03/15/2027 | 65,000 | $78.00 |
| 01/14/2019 | 4.0% due 12/01/2046 | 20,000 | $75.75 |